# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

DECISION AND ORDER
08-CR-6087 CJS

SALEH MOHAMED TAHER SAEED,

Defendant.

## INTRODUCTION

The defendant, Saleh Mohamed Taher Saeed, stands accused in a ten-count indictment charging him with crimes relating to money laundering. In the defendant's omnibus motion, he moved to suppress statements he purportedly made following his arrest on February 24, 2007.

In regard to the defendant's application, an evidentiary hearing was held on December 17, 2008 and January 6, 2009. Special Agent Raymond Villanueva ("Villanueva") of the Department of Homeland Security Immigration and Custom Enforcement ("ICE"), Special Agent Scott Forehand ("Forehand") of the Federal Bureau of Investigation ("FBI") and Muhammad Abdulwahed ("Abdulwahed"), an interpreter with the FBI, testified at the hearing.

The Court, having considered the testimony presented and exhibits received into evidence at the hearing, and having made evaluations regarding credibility, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Villanueva is currently employed by ICE as a supervisory special agent, a position he has held since April 1, 2007. In February of 2007 he was a senior special agent with ICE, assigned to financial and narcotics investigations. On February 24, 2007, pursuant to his duties with ICE, Villanueva participated in the execution of a number of search and arrest warrants in the Rochester area. More specifically, he was the leader of the team assigned to execute the arrest warrant for the defendant. In that regard, Villanueva and his team, along with another team responsible for executing a search warrant, went to 934 Hudson Avenue in the City of Rochester at about 5:40 to 5:45 p.m. A convenience store as well as a residence were located within 934 Hudson Avenue. The search warrant team proceeded first and secured the premises. Then the arrest warrant team, led by Villanueva and including Forehand of the FBI, entered 934 Hudson Avenue. Villanueva and Forehand recognized the defendant from a photograph which had been displayed in a pre-operational briefing. They approached him without guns drawn, identified themselves and asked, "are you Mr. Saleh Saeed?" The defendant replied, "Yes I am." This exchange occurred in English. Next, also in English, Villanueva and Forehand explained why they were there and that they had an interpreter in place if the defendant wished to speak with them in his native tongue. As Villanueva and Forehand were speaking to the defendant, he indicated that that he did want an interpreter.

Abdulwahed was born in Cairo, Egypt and his native language is Arabic. He also speaks English and French. He immigrated to the United States in 1969 and began working for the Pillsbury Company as a controller in the frozen food division. Because he

spoke Arabic, Pillsbury sent him to Saudi Arabia to assist in the company's efforts to secure a presence in that country. Subsequent to working for Pillsbury, Abdulwahed took a position with Century Manufacturing Company in Bloomington, Minnesota as its chief financial officer. As such, he traveled to Saudia Arabia, Kuwait, and Egypt to pursue markets for the company's product. He then worked for ConAgra Company as its managing director in Manchester, England with responsibility for sales in the Middle East.

Abdulwahed retired from ConAgra in 1999, and in March of 2002 and joined the FBI as an Arabic translator. He is not a full time employee of the FBI, but rather is on contract. As to his work with the FBI, Abdulwahed was selected to participate in a month-long language school at Fort Gordon in Augusta, Georgia, where he received specialized training in the Yemen dialect. He completed the language school by taking and passing a full-day test involving the ability to translate from Arabic to English and vice versa.

In connection with his responsibilities with the FBI, Abdulwahed was directed to be in Rochester, New York on February 24, 2007 to assist law enforcement in interviews of individuals who were to be arrested that day. On February 24, 2007, following his arrival in Rochester, he was taken by an FBI agent to 934 Hudson Avenue.

After the defendant indicated that he wanted an interpreter, Villanueva and Forehand called upon Abdulwahed, who, by then, had arrived at 934 Hudson Avenue. They introduced Abdulwahed to the defendant, and from that point on Abdulwahed assisted Villanueva and Forehand in their interview of the defendant. In that regard, Abdulwahed translated verbatim from English into Arabic questions put to the defendant

by Villanueva and Forehand, and he translated verbatim from Arabic into English the defendant's responses.

First, through the interpreter, Villanueva and Forehand explained to the defendant that he was going to have to accompany them to the Federal Building in Rochester. Subsequently, about thirty minutes after they had first entered the store, Villanueva and Forehand removed the defendant from 934 Hudson, handcuffed him behind his back, placed him in their vehicle, and transported him to the Federal Building, arriving at about 6:30 p.m. Upon arrival, the defendant was taken to the FBI offices and placed inside the detention room/holding cell, which was approximately eight feet square and which contained a small table with two benches. The handcuffs remained on the defendant. After placing the defendant inside the detention room/holding cell, Villanueva and Forehand left to organize their interview.

At about 6:55 p.m., Villanueva and Forehand re-entered the detention room/holding cell with Abdulwahed. Subsequently, the defendant's handcuff's were removed for the interview process. Upon re-entering, Villanueva and Forehand reintroduced themselves to the defendant. With Abdulwahed interpreting, Villanueva and Forehand explained to the defendant what had happened at the store, the nature of their investigation, and the reason for his arrest. Immediately thereafter, Forehand, proceeded to inform the defendant of his *Miranda* warnings by reading out loud in English from Exhibit # 2, an "Advice of Rights" form, and then asking Abdulwahed, who was holding a copy of Exhibit # 2, to interpret what he said. Exhibit # 2, as reproduced in its entirety reads as follows:

FD-395 (Rev. 11-5-02)

# ADVICE OF RIGHTS

Place **Rochester NY**
Date **2-24-07**
Time **6:55 PM**

## YOUR RIGHTS

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.


I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Signed *[signature]*

Witness: *[signature]*, SSA
Witness: *[signature]*, SA/FBI
Time: **7:02 PM  2-24-07**

With respect to the advisement of rights, Villanueva testified at the hearing as follows:[1]

> Q. Now, can you tell -- explain to us how the rights from this form were read by Special Agent Forehand?
>
> A. Yes, they were read one at a time. We afford the opportunity to the translator to translate that one single right and asking Mr. Saeed if he understood his rights and making, again, sending that answer back from Mr. Saeed that he understood the rights before moving into the other one.
>
> Q. After Scott Forehand read him the first right, what was Mr. Saeed's response through the translator?
>
> A. That he understood --
>
> Q. Does the translator say what Mr. Saeed said did he understand the right?
>
> A. Yes, sir.
>
> Q. And was that the same response that you received for all the rights?
>
> A. Yes, sir.
>
> Q. Now, after the rights had been read by Special Agent Forehand, did he advise him of any additional information from the form?
>
> A. From the form we ask him if he was willing to --
>
> MR. PARRINELLO: Objection to the pronoun.
>
> THE COURT: Sustained. Who read the form?
>
> THE WITNESS: Special Agent Forehand read the form.
>
> Q. And what did he say to him at the end after he read him

---

[1] Hearing Transcript, December 17, 2008, p. 15, lines 21-25; p.16, lines 1-25; p.18, line 1.

the rights?

A. He asked him if he was willing to waive his rights and talk to us by signing this form at the bottom.

Q. Now, did you receive a response from Mr. Saeed through the translator?

A. Yes.

Q. What was the response?

A. That he was willing to waive his rights to remain silent and he did proceed to sign the form at the bottom.

Q. Mr. Saeed's signature?

A. Yes.

Q. Is contained – did he sign it in front of you?

A. Yes, sir.

Q. After that was done, did you make any other notations on the form, Government Exhibit No. 2?

A. At the bottom of the form I signed as a witness, Special Agent Forehand signed, and the time that form was actually signed.

However, Abdulwahed, the interpreter, testified at the hearing as follows:[2]

Q. Now, there came a time you were shown exhibit 2. I'm going to hand you exhibit 2. Now, there came a time that you were handed exhibit 2, is that right?

A. Yes, sir.

Q. And who handed you exhibit 2?

---

[2]Hearing Transcript, December 17, 2008, p.126, lines 1-25; p. 127, lines 1-25, p. 128, lines 1-25, p. 129, lines 1-5.

A. Mr. Ray.[3]

Q. Now, do you see on exhibit 2 that there are seven questions?[4]

A. Yes, sir.

Q. Do you see the seven questions?

A. Yes, sir.

Q. And were those questions read out loud by Mr. Ray?

A. Yes, sir.

Q. And when Mr. Ray read them to you, did you translate them directly to Mr. Saeed as they were read?

A. Yes, sir.

Q. And after you translated them to Mr. Saeed, did Mr. Ray then ask in English, did he ask Mr. Saeed if he understood each question?

A. First Mr. Saeed answered the question he did understand it and I translate that to Ray.

Q. No, I'm saying between the time that Ray read the question, the first question or the question No. 2, you have the right to remain silent?

A. Yes.

Q. And then you translated to Saeed?

A. Yes, sir.

Q. And before Saeed answers yes, Mr. Ray says, "do you understand what I have said"?

A. Yes.

Q. And then you translate that?

A. Yes, sir.

---

[3]Presumably he is referring to Villanueva, whose first name is Raymond.

[4]As can be seen from an examination of Exhibit # 2, the form contains not questions, but statements.

Page 8 of 17

Q. And then Mr. Saeed says to you yes?

A. Yes.

Q. And you tell Ray that?

A. Yes, sir.

Q. Okay. And that went on for these first seven questions, right?

A. Yes, sir.

Q. And then after those seven questions – oh, by the way, who was holding the form when the questions were asked?

A. I have a copy of the form and Mr. Ray has a copy of the form.

Q. So there were two copies in the room?

A. Yes, just a blank copy that I can read and he was reading.

Q. Okay. And were you translating what he was reading or what was on the sheet?

A. Was what he was reading and but I was also following what he was saying.

Q. And where were you sitting or standing?

A. No, I was sitting in front of Mr. Saeed.

Q. In front of, across from him?

A. Across.

Q. Like you and I across the table?

A. Yes, sir.

Q. And as you're sitting there, I'm Mr. Saeed, across the table and to your right at the end of the table is Ray?

A. Yes.

Q. Okay. And now -- while this was -- strike that. Forget that. Now, did there come a time that Mr. Ray asked Mr. Saeed to sign exhibit 2, the document?

A. Yes, sir.

Q. And what did Mr. Ray say?

A. After he asked him, again, I translated did you understand every item in that list and he said, "yes, I did."

Q. Yes. Then what happened?

A. And then he asked him to sign and Mr. Saeed signed.

Q. Well, what did he say?

A. He said, yes, I will sign I understood all the questions.

Q. And so after the seven questions, that is, when Mr. Ray asked Mr. Saeed to sign the document?

A. Well, first he asked him if he understood every question of the seven questions that has been and Mr. Saeed, yes, he did.

Q. And then he said, Mr. Saeed, will you sign the document and you translated that word for word?

A. Yes, sir.

Q. And did Mr. Saeed then after the seven questions sign the document?

A. Yes, he did.

Q. And did he sign it in front of you?

A. Yes, sir, I saw him sign it.

Despite Villanueva's testimony that Forehand read the defendant the eighth statement on Exhibit #2, ("I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present."), the Court finds, based upon Abdulwahed's testimony, that he did not interpret the eighth

statement on Exhibit # 2 for the defendant. However, Abdulwahed did interpret verbatim the first seven statements on Exhibit # 2, after they were read in English by Forehand, and after interpreting each one, asked the defendant in Arabic if he understood what he had just said. For each of the first seven statements on Exhibit # 2, the defendant responded in Arabic that he did understand. Then Abdulwahed translated for the defendant into Arabic the question, "did you understand every item in the list?", to which the defendant replied in Arabic "yes." Next, Forehand asked the defendant in English if he would sign the document. This was translated by Abdulwahed. The defendant responded in Arabic "yes," and signed Exhibit # 2 at approximately 7:02 p.m.

Villanueva, with Abdulwahed interpreting, then interviewed the defendant for approximately an hour and a half. While Forehand was present throughout the interview process, it was Villanueva who conducted the questioning. Villanueva asked the defendant if he had ever sent monies outside of the United States on behalf of customers for a profit, to which the defendant responded that he had never been involved in any type of money remitting business. Villanueva also asked the defendant if he had transferred money or moved money on behalf of Hizballah or allowed Hizballah to use his money to support the cause. The defendant replied that he had never done that, adding that, "this is my country and I love it."

The defendant was then shown a series photographs, as contained in Exhibit # 3. Villanueva displayed the photographs for the defendant one at a time, and asked him if he could identify anything or anybody in the pictures. With respect to pictures one through nine in the series, the defendant responded that he did not recognize anyone or

anything. However, as he was shown picture # 8 and picture # 9, he began sweating and appeared nervous and said something to Abdulwahed in English instead of Arabic. Villanueva did not note what the defendant said in English, but rather directed Abdulwahed to instruct the defendant to speak in Arabic.

Upon being shown pictures 10 and 11, the defendant identified an individual in the photographs as Kamal. Villanueva asked about Kamal, and the defendant explained that he had known Kamal for about one and a half years, that he initially met him as a customer at the store, but that they then had become good friends. The defendant further indicated that he had once sent $16,000 from his account into Kamal's account in Bahrain, per Kamal's instructions, to support Kamal's ill mother.

Villanueva additionally questioned the defendant about whether he knew an individual named Alomari and if so, if he was aware of Mr. Alomari sending any money overseas on behalf of customers. Villanueva also asked the defendant if he was aware of any relationship between Alomari and Kamal. The defendant indicated that he knew Alomari as a friend who owned a deli in the Rochester area, but that he did not know anything about money service activities on Alomari's part, nor did he know if Alomari and Kamal were acquaintances.

Villanueva concluded the interview by asking the defendant about his financial transactions. More specifically, Villanueva questioned him about whether he had a New York State License and whether he was registered with the Financial Crimes Enforcement Network. The defendant responded that he is not licensed or registered.

Villanueva interviewed the defendant in a friendly manner and did not raise his voice. At no time during the interview did the defendant ever ask for a lawyer or ever request that the questioning stop. Neither Villanueva nor Forehand ever made any promises to the defendant in exchange for his speaking; nor did they ever threaten him, display their weapons at any time, or use any force against him to get him to talk. At some point, the defendant was offered a soda, which he accepted.

## CONCLUSIONS OF LAW

It is, of course, clear that the Government may not use any statements obtained from a defendant, whether exculpatory or inculpatory, which were the product of custodial interrogation, unless prior to any questioning the defendant was advised of his constitutional rights and knowingly, intelligently and voluntarily waived such rights. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Colorado v. Spring*, 479 U.S. 564 (1987); *Edwards v. Arizona*, 451 U.S. 477 (1981). Additionally, it is well settled that a defendant's statements must be voluntary based on the "totality of the circumstances." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). A statement is not voluntary if it is obtained by any type of physical or psychological coercion or by improper inducement so that a defendant's will was overborne. *Haynes v. State of Washington*, 373 U.S. 503, 513-14 (1963). "The factors to be considered include 'the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Alvarado*, 882 F.2d 645, 649 (2d Cir. 1989) (quoting *United States v. Mast*, 735 F.2d 745, 749 (2d Cir. 1984)). The Government bears the

burden of proving by a preponderance of the evidence both that a defendant, having been advised of his constitutional rights guaranteed under Miranda, knowingly, intelligently and voluntarily waived his rights, and that any statements that he made were voluntary. Lego v. Twomey, 404 U.S. 477, 482-89 (1972).

To establish a valid waiver, the Government must prove that the relinquishment of rights on a defendant's part was voluntary, and additionally that the defendant had a full awareness of the right being waived and of the consequences of waiving that right. United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). However, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel" is not required. North Carolina v. Butler, 441 U.S. 369, 373 (1979). Rather, a valid waiver may be inferred from "silence, coupled with an understanding of [the defendant's] rights and a course of conduct indicating waiver." Id. As to the question of a knowing and intelligent waiver, the Second Circuit has explained:

> When considering whether a defendant waived his constitutional rights, we consider all relevant circumstances, employing a presumption that the defendant did not waive his rights. Butler, 441 U.S. at 373, 99 S.Ct.
> *****
> While merely answering questions after Miranda warnings have been given does not necessarily constitute a waiver, no express statement of waiver is required. Butler, 441 U.S. at 373, 99 S.Ct. at 1757; United States v. Rubio, 709 F.2d 146, 152 (2d Cir.1983); United States v. Boston, 508 F.2d 1171, 1175 (2d Cir. 1974), cert. denied, 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). "'[I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.'" Rubio, 709 F.2d at 152-53 (quoting Butler, 441 U.S. at 373, 99 S.Ct. at 1757).

United States v. Scarpa, 897 F.2d 63, 68 -69 (2d Cir.1990).

A language barrier is certainly a factor to consider when determining the validity of a waiver. United States v. Heredia-Fernandez, 756 F.2d 1412, 1415 (9th Cir. 1985), cert.

*denied*, 474 U.S. 836 (1985), *sub nom Heredia-Fernandez v. United States*, 474 U.S. 836 (1985) ("One precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner.") However, the determination is not difficult when the suspect is advised of his rights in a language that he understands. *United States v. Boon San Chong*, 829 F.2d 1572, 1574 (11th Cir. 1987).

Applying the above-stated principles of law to its findings of fact, the Court first determines that the Government has established by a preponderance of evidence that the defendant was advised of his *Miranda* rights and knowingly and intelligently waived such rights. In this regard, the defendant was given his *Miranda* warnings both in English and in his native tongue, Arabic. At the outset, he was read line one on Exhibit # 2 both in English and in Arabic. Line one reads, "Before we ask you any questions, you must understand your rights." He was asked both in English and Arabic if he understood this statement and responded in Arabic that he did. He was then given each of his five *Miranda* rights, as they appear on lines two through six on Exhibit # 2, in both English and Arabic, and, after each, he was asked in both English and Arabic if he understood the right he had just been given. With respect to each warning he stated in Arabic that he did. He was then asked both in English and in Arabic if he understood every item on the list and indicated in Arabic that he did. Finally, the defendant was asked both in English and in Arabic if he would sign the document. He replied in Arabic yes, and he signed Exhibit #2. Thereafter, the defendant was interviewed for approximately one and a half hours, a relatively short period of time. He was not subjected to any type physical or psychological deprivations, and there is no suggestion of any kind of intimidation,

coercion or deception. See Moran v. Burbine, 475 U.S. 412, 421 (1986) (relinquishment of rights "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception"). Additionally, the interview itself was conducted in a friendly, non-confrontational manner. United States v. Scarpa, 897 F.2d at 68 ("relaxed and friendly" conversations contributed to finding a non-explicit waiver). Even though the Government has failed to prove an express waiver, viewing the totality of the circumstances, the Court concludes that the defendant waived his constitutional rights with "a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id. at 69; see also United States v. Jin Kyoo Park, 218 Fed Appx. 74, 76 (2d Cir. 2007) (even though defendants did not sign waivers of Miranda rights, they "understood their rights when they were read aloud and translated into Korean . . . .").

Second, the Court determines that the Government has established by preponderance of evidence that the statements of the defendant were voluntary. As indicated above, the defendant was interviewed for only about an hour and a half, and the interview occurred during the early evening of February 24, 2007. His handcuffs were removed for the interview process. During that time he was interviewed, the defendant was not threatened in any way, nor were any promises made to him to get him to talk. Furthermore, the defendant clearly was not tricked into speaking, since at the outset, he was advised of the nature of the investigation. Moreover, the defendant never indicated that he did not want to speak to the police or that he wanted an attorney. Finally, the defendant was not subjected to any physical or psychological coercion, and he was questioned in a friendly rather than aggressive manner.

## CONCLUSION

Accordingly, the defendant's motion (Docket # 98) to suppress his statements is denied.

IT IS SO ORDERED.

DATED: April 27, 2009
       Rochester, New York    ENTER.

*Charles Siragusa*
CHARLES J. SIRAGUSA
United States District Court Judge